**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| United States of America, | : | Case No. 3:12 CV 1285 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Three Hundred Eleven Thousand, Five, | : | |
| Hundred Seventy Dollars in U.S. Currency | : | |
| ($311,570.00) | : | **MEMORANDUM OPINION** |
| Defendant, | : | **AND ORDER** |

### I. INTRODUCTION

On May 22, 2012, the United States of America ("Plaintiff" or "the government") filed the above-captioned *in rem* action seeking forfeiture of $311,570.00 in United States Currency ("Defendant Currency") (Docket No. 1). The government contends that this money is connected to, or the result of, narcotics trafficking, in violation of Title 21 of the United States Code, more commonly known as the Controlled Substances Act (Docket No. 1). In response to this civil action, Claimant Philippe Medina ("Claimant") now asserts that he is the rightful owner of the property in question. Claimant has filed both an Answer to the Complaint as well as a Verified Claim seeking an award or return of the Defendant Currency (Docket Nos. 5 and 6).

Pending are Plaintiff's Motion for Remedies for Failure to Respond to Discovery Requests (Docket No. 26), and Motion to Strike and/or Motion for Summary Judgment, filed July 1, 2013 (Docket No. 27), Claimant's Opposition, filed July 29, 2013 (Docket No. 29), and Plaintiff's Replies, filed August 12, 2013 (Docket Nos. 32 and 33). For the reasons that follow, Plaintiff's Motion to Strike is denied; however, the Motion for Summary Judgment is granted.

## II. FACTS

According to the government, on December 30, 2011, Ohio State Highway Patrol ("OSHP") Trooper Kurt Beidelschies ("Trooper Beidelschies") observed a 2012 Chevrolet Traverse ("Traverse") traveling above the posted speed limit along westbound Interstate 80 ("Ohio Turnpike") near mile post seventy-one in Perrysburg Township, Ohio (Docket No. 27, Attachment 1, p. 1 of 9). Trooper Beidelschies activated his lights and siren in an effort to initiate a traffic stop (Docket No. 27, Attachment 1, p. 1 of 9). The Traverse continued westbound for another one-half mile before pulling over to the side of the road (Docket No. 27, Attachment 1, p. 1 of 9). There were two occupants in the vehicle (Docket No. 27, Attachment 1, p. 1 of 9).

Trooper Beidelschies approached the Traverse from the right side and requested the driver's identification information (Docket No. 27, Attachment 1, pp. 1-2 of 9). The driver, whose license identified him as twenty-five-year old New York resident Claimant Philippe Medina, also provided Trooper Beidelschies with a copy of the rental agreement for the Traverse (Docket No. 27, Attachment 1, p. 2 of 9). Records show the Traverse had been rented to one Peter Vasquez ("Vasquez") at New York's LaGuardia Airport on December 28, 2011, and was due back to the same location on December 29, 2011 (Docket No. 27, Attachment 1, pp. 2-3 of 9). The vehicle's passenger was later identified as twenty-one-year old New York resident Kevin Medina ("Medina") (Docket No. 27, Attachment 1, p. 2 of 9).

Around this time, OSHP Troopers Alejo Romero ("Trooper Romero") and Stacy Arnold ("Trooper Arnold") arrived at the scene (Docket No. 27, Attachment 1, p. 3 of 9). Claimant was asked to exit the Traverse and sit in Trooper Beidelschies' patrol car (Docket No. 27,

2

Attachment 1, p. 3 of 9). Once inside the patrol car, Trooper Beidelschies questioned Claimant about his travels (Docket No. 27, Attachment 1, p. 3 of 9). Claimant stated he and Medina were half-brothers on their way to visit Medina's family in Chicago, although Claimant was not sure exactly where in Chicago the two were headed (Docket No. 27, Attachment 1, p. 3 of 9). Claimant stated he had never before been to Chicago but was also planning on visiting his own family while in the city (Docket No. 27, Attachment 1, p. 3 of 9). Trooper Beidelschies observed that Claimant was physically shaking, breathing heavily, and the pulse in the back of his neck was visibly pounding (Docket No. 27, Attachment 1, p. 3 of 9).

Trooper Beidelschies then asked Claimant about his relationship with Vasquez, the renter of the Traverse (Docket No. 27, Attachment 1, p. 3 of 9). Claimant indicated Vasquez was his cousin (Docket No. 27, Attachment 1, p. 3 of 9). A law enforcement records check of Claimant's driving status revealed that Claimant's driver's license was suspended (Docket No. 27, Attachment 1, pp. 3-4 of 9).

Trooper Beidelschies returned to the Traverse to speak with passenger Medina, who indicated he and Claimant were traveling to Chicago to visit Claimant's family (Docket No. 27, Attachment 1, p. 4 of 9). Trooper Beidelschies asked Medina to remain in the Traverse and roll up the windows (Docket No. 27, Attachment 1, p. 4 of 9). At this point, Troopers Romero and Arnold proceeded to conduct a dog sniff walk-around the Traverse using their drug detection dog, K-9 Rony (Docket No. 27, Attachment 1, p. 4 of 9). During this walk-around, Trooper Beidelschies returned to his patrol car to speak with Claimant (Docket No. 27, Attachment 1, p. 4 of 9). Claimant admitted knowing his driver's license was suspended (Docket No. 27, Attachment 1, p. 4 of 9). Trooper Beidelschies then relayed to Claimant Kevin Medina's version

3

of events (Docket No. 27, Attachment 1, p. 4 of 9). He also told Claimant that he appeared extremely nervous and was shaking (Docket No. 27, Attachment 1, p. 4 of 9). Claimant stated that he was cold (Docket No. 27, Attachment 1, p. 4 of 9). Trooper Beidelschies asked Claimant if the Traverse contained any drugs, weapons, or large amounts of money (Docket No. 27, Attachment 1, p. 4 of 9). Claimant said that it did not (Docket No. 27, Attachment 1, p. 4 of 9). Upon completion of the walk-around, Trooper Beidelschies notified Claimant that K-9 Rony had positively alerted to an odor of narcotics in the vehicle (Docket No. 27, Attachment 1, p. 4 of 9). Trooper Beidelschies again asked Claimant if the car contained anything unusual (Docket No. 27, Attachment 1, p. 4 of 9). Claimant stated there were no drugs or money in the car (Docket No. 27, Attachment 1, p. 4 of 9).

Based on the positive K-9 alert, Troopers Beidelschies, Arnold, and Romero secured Medina in the back of one of the patrol cars and conducted a probable cause search of the Traverse (Docket No. 27, Attachment 1, pp. 4-5 of 9). During the search, Trooper Beidelschies found nine large vacuum-sealed bundles of United States currency, separated by denomination and rubber-banded together, inside a Stow-and-Go compartment (Docket No. 27, Attachment 1, p. 5 of 9). The Traverse also contained two gym bags that, when opened, emitted the smell of raw marijuana (Docket No. 27, Attachment 1, p. 5 of 9). One of the bags was later found to contain marijuana "shake," small, non-measurable quantities of marijuana (Docket No. 27, Attachment 1, p. 5 of 9). The troopers also found three cell phones and a GPS unit (Docket No. 27, Attachment 1, p. 5 of 9).

Trooper Beidelschies returned to his patrol car and advised Claimant of his Miranda rights (Docket No. 27, Attachment 1, p. 5 of 9). Claimant again denied knowledge or ownership

of the found currency (Docket No. 27, Attachment 1, p. 5 of 9). The troopers transported Claimant and Medina back to the OSHP post in Bowling Green, Ohio (Docket No. 27, Attachment 1, p. 5 of 9). At that point, Drug Enforcement Agency ("DEA") Task Force Agent Jeremy Langenderfer ("Agent Langenderfer") arrived to assist in the investigation (Docket No. 27, Attachment 1, p. 5 of 9). A second dog sniff walk-around was executed and K-9 Rony again alerted to the box containing the seized currency (Docket No. 27, Attachment 1, p. 6 of 9). The amount was later noted to total $311,570.00 (Docket No. 27, Attachment 1, p. 6 of 9).

Meanwhile, Agent Langenderfer inspected the three cell phones seized from the Traverse (Docket No. 27, Attachment 2, p. 1 of 2). Agent Langenderfer was able to identify phone numbers for two of the three phones and had those numbers checked through DEA databases (Docket No. 27, Attachment 2, p. 1 of 2). This search revealed that one of the cell phone numbers was connected to a main target in a DEA case out of Connecticut involving the distribution of large amounts of cocaine (Docket No. 27, Attachment 2, p. 1 of 2). Agent Langenderfer and OSHP Trooper Daniel Bionci ("Trooper Bionci") read Claimant his Miranda rights and attempted to interview him, but Claimant asked for an attorney (Docket No. 27, Attachment 2, p. 1 of 2). Agent Langenderfer and Trooper Bionci then interviewed Medina, who denied any knowledge of the Defendant Currency (Docket No. 27, Attachment 2, p. 2 of 2). Medina also stated that Claimant had picked him up to go for a ride to upstate New York to rent a cabin (Docket No. 27, Attachment 2, p. 2 of 2).

In an affidavit dated July 26, 2013, Claimant presented a slightly different version of the facts. According to Claimant, on December 30, 2011, he was driving the Traverse down the Ohio Turnpike within the legal speed limit when he was stopped by Trooper Beidelschies (Docket No.

29, Attachment 1, p. 1 of 2). Claimant provided his driver's license and the rental agreement for the Traverse and was then asked to exit the vehicle (Docket No. 29, Attachment 1, p. 1 of 2). Once placed inside a patrol car, Claimant alleges Trooper Beidelschies began asking him several "accusatory style" questions which only intensified after discovery of the Defendant Currency (Docket No. 29, Attachment 1, p. 1 of 2). According to Claimant, he did not answer any questions or provide any information as to the reason for or destination of his travels (Docket No. 29, Attachment 1, pp. 1-2 of 2). Claimant also denied that the Defendant Currency was used in exchange for, or during the sale of, controlled substances (Docket No. 29, Attachment 1, p. 2 of 2). According to Claimant, he was merely transporting the Defendant Currency to an individual in Chicago in exchange for $40,000.00 (Docket No. 29, Attachment 1, p. 2 of 2).

### III. PROCEDURAL HISTORY

On May 22, 2012, Plaintiff filed a Complaint in Forfeiture, alleging that the Defendant Currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) as either proceeds of or money used to facilitate drug trafficking, in violation of the Controlled Substances Act (Docket No. 1). Claimant filed an Answer on June 18, 2012 (Docket No. 4). On June 19, 2012, Claimant filed both an Answer with Counterclaims and Defenses as well as a Verified Claim asserting lawful ownership of the Defendant Currency (Docket Nos. 5 and 6).

On February 15, 2013, via e-mail and hard copy, Plaintiff sent Claimant's counsel, Lance Lazzaro ("Mr. Lazzaro") interrogatories, requests for production, and a request to depose Claimant in an effort to better ascertain Claimant's interest in the Defendant Currency (Docket No. 32, Attachments 1 and 2). On March 28, 2013, Plaintiff requested an extension of discovery and dispositive motion deadlines (Docket No. 22 ). The undersigned Magistrate granted this

request on April 5, 2013 (Docket No. 23). On July 1, 2013, Plaintiff filed two motions: (1) a Motion for Remedies under FED. R. CIV. P. 37(c), seeking to bar Claimant from supporting his claim with information withheld during discovery; and (2) a Motion requesting that this Court strike Claimant's Verified Claim for lack of standing or, in the alternative, grant summary judgment for a lack of any genuine issue of material fact (Docket No. 27). Claimant filed his Opposition on July 29, 2013 (Docket No. 29). Plaintiff filed its Replies on August 12, 2013 (Docket Nos. 32 and 33).

## IV. DISCUSSION

### A. MOTION TO STRIKE

As an initial matter, Plaintiff moves, under the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules") to strike Claimant's Verified Claim for lack of standing (Docket No. 27, p. 11 of 24). According to Plaintiff, Claimant's mere possession of the Defendant Currency at the time of its seizure is not sufficient to establish standing (Docket No. 27, pp. 14-16 of 24). Rather, it is only Claimant's attempt to "salvage drug proceeds" (Docket No. 27, pp. 14-16 of 24). Claimant disagrees, arguing that he has properly established both possession and ownership of at least a portion of the Defendant Currency (Docket No. 29, pp. 7-8 of 11).

#### 1. STANDARD OF LAW

Standing, the issue of whether one is entitled to pursue a claim, is a threshold matter in every federal case. *McGlone v. Bell*, 681 F.3d 718, 728 (6th Cir. 2012) (*citing Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Although typically the responsibility of the plaintiff, standing in forfeiture cases is a burden also shared by a third party claimant. *U.S. v. $515,060.42 in United*

*States Currency*, 152 F.3d 491, 497 (6th Cir. 1998). This is because an action for civil forfeiture is an *in rem* proceeding in which the defendant is actually the seized property. *United States v. One-Sixth Share of James J. Bulger in all Present and Future Proceeds of Mass Millions Lottery Ticket No. M246233*, 326 F.3d 36, 40 (1st Cir. 2003). Therefore, any defenses to the civil forfeiture must be brought by a third party intervenor. *Id*. This third party must himself have independent standing. *Id*. Such standing involves satisfaction of both constitutional and statutory requirements. *515,060.42*, 152 F.3d at 497.

By their very nature as *in rem* proceedings, civil forfeiture actions are statutorily governed by the Supplemental Rules. Under these rules, a third party must submit a claim to the seized property within thirty-five (35) days of the government's complaint. SUPP. ADMIRALTY AND MAR. CLAIM R. G(5). This claim must: (1) identify the specific property claimed; (2) identify the claimant and state the claimant's interest in the property; (3) be signed by the claimant under penalty of perjury; and (4) be served on the government attorney designated under Rule G(4)(a)(ii)(C) or (b)(ii)(D). SUPP. ADMIRALTY AND MAR. CLAIM R. G(5)(a)(i). At any time before trial, the government may move to strike a claim for failure to comply with this rule or because a claimant lacks standing. SUPP. ADMIRALTY AND MAR. CLAIM R. G(8)(c)(i)(A), (B).

As for constitutional standing, it is well established that a claimant must first demonstrate "such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth*, 422 U.S. at 498-99. In its initial stages, this demonstration is rather minimal. A claimant must show that he has "a colorable ownership, possessory or security interest in at least a portion of

8

the defendant property." *$515,060.42*, 152 F.3d at 497 (*citing United States v. 16510 Ashton*, 47 F.3d 1465, 1470 (6th Cir. 1995)). The most obvious type of colorable interest is an ownership interest, but simple possessory interests may also "be sufficient to bestow standing on a claimant to contest forfeiture." *$515,060.42*, 152 F.3d at 498. However, in cases of pure physical possession, additional explanation or contextual information regarding the claimant's interest in the property is required. *Id*. Mere "naked possession" claims are insufficient. *Id*. "The assertion of simple physical possession of property as a basis for standing must be accompanied by factual allegations regarding how the claimant came to possess the property, the nature of the claimant's relationship to the property, and/or the story behind the claimant's control of the property." *Id*.

    **2.**    **APPLICATION**

In relevant part, Claimant's Verified Claim states that "I, Philippe Medina, am the lawful owner of the $311,570.00 in United States currency which was initially seized by local law enforcement on December 30, 2011, in the vicinity of Findlay, Ohio and later seized by federal authorities from the [DEA] on or about January 5, 2012" (Docket No. 5, p. 1 of 2). In his Opposition to Plaintiff's Motion to Strike, Claimant alleges entitlement to the Defendant Currency given his possession of it at the time of its seizure (Docket No. 29, pp. 7-8 of 11). Given the discouragement of mere "naked possession" claims, Claimant's possession is not enough to satisfy the constitutional standing requirements.

However, in his sworn Affidavit, dated July 26, 2013, Claimant alleges partial entitlement to at least $40,000.00 of the Defendant Currency, claiming he "received the $311,570.00 in United States currency from another individual pursuant to an agreement whereby [he] would retain $40,000.00 in United States currency of the $311,570.00 in United

States currency after delivering said $311,570.00 in United States currency to a different individual located in Chicago, Illinois" (Docket No. 29, Attachment 1, p. 2 of 2).

Although minimal, Claimant's allegation properly states *how* he came to possess the Defendant Currency, his *relationship* to at least part of the Defendant Currency, and the *story* behind his control of the property, in satisfaction of constitutional standing requirements (Docket No. 29, Attachment 1, p. 2 of 2). Therefore, this Court finds that Claimant does have standing to contest the civil forfeiture in this case. As such, Plaintiff's Motion to Strike for lack of standing is denied.

### B.  MOTION FOR SUMMARY JUDGMENT

In the alternative, Plaintiff prays this Court grant summary judgment in its favor, claiming there is no genuine issue of material fact that might entitle Claimant to the Defendant Currency (Docket No. 27, p. 17 of 24). Claimant disagrees (Docket No. 29).

#### 1.  STANDARD OF LAW

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show "that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(a). The moving party bears "the initial burden of proving that no genuine issue of material fact exists." *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 710 (6th Cir. 2001). The court must draw all reasonable inferences in the light most favorable to the nonmoving party. *Id*. Once the moving party has met its burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Averill v. Gleaner Life Ins. Soc'y*, 626 F.Supp.2d 756, 761 (N.D. Ohio 2009) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

250 (1986)) (*quoting* FED.R.CIV.P. 56(e)).

Once the burden shifts, FED.R.CIV.P. 56(e) requires the nonmoving party "go beyond the [unverified] pleadings" and present some type of concrete evidentiary material in support of its position. *Averill*, 626 F.Supp.2d at 761 (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The nonmoving party "cannot rest on its pleadings or merely reassert its previous allegations." *Averill*, 626 F.Supp.2d at 761. It is "insufficient 'simply [to] show that there is some metaphysical doubts as to the material facts.'" *Id*. (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

In deciding a motion for summary judgment, "the evidence of the non-moving party will be believed as true, all doubts will be resolved against the non-moving party, all evidence will be construed in the light most favorable to the non-moving party, and all inferences will be drawn in the non-moving party's favor." *Averill*, 626 F.Supp.2d at 761 (*citing Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992)). Summary judgment will only be rendered if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Averill*, 626 F.Supp.2d at 761 (*citing Celotex,* 477 U.S. at 322); *see also* FED.R.CIV.P. 56(c).

### 2. APPLICATION

According to Plaintiff, several alleged facts support its Motion for Summary Judgment, including: (1) K-9 Rony's alert to an odor of narcotics in the Traverse; (2) the two discovered gym bags that smelled of marijuana and contained marijuana "shake;" (3) the Defendant Currency, found rubber-banded and wrapped in vacuumed-sealed plastic bags; (4) the lack of

any measurable amount of narcotics; (5) Claimant's on-scene denial of both knowledge and ownership of the Defendant Currency; (6) Claimant and Medina's on-scene behavior and their inconsistent stories; (7) the expired rental agreement; (8) the amount of the Defendant Currency; and (9) the established connection between the numbers on the seized cell phones and known drug traffickers in Connecticut and Chicago (Docket No. 27, pp. 19-23 of 24). As stated above, in order to refute Plaintiff's claims, Claimant must "set forth specific facts showing that there is a genuine issue for trial." *Averill*, 626 F.Supp.2d at 761. He must "go beyond the . . . pleadings" and present some type of concrete evidentiary material in support of his position. *Id*. Claimant fails to do so.

Claimant first alleges that organizing large amounts of money into certain value amounts is not indicative of narcotics proceeds; rather "organizing large amounts of money in such a manner is common when transporting such money for any purpose. If you open any one of those armored vehicles used to transport money, the money being transported will be organized into set dollar amounts . . . it has nothing to do with narcotics" (Docket No. 29, pp. 9-10 of 11). While this may or may not be true, it merely casts "metaphysical doubt" on a material fact, which is insufficient to overcome a motion for summary judgment. *Averill*, 626 F.Supp.2d at 761. The same is true of Claimant's assertion that the use of rubber bands indicates only that the individuals transporting the money did not have pre-printed labels at their disposal (Docket No. 29, p. 10 of 11); it is mere conjecture. With regard to the government's allegation that the Defendant Currency was connected to supposed drug operations, Claimant argues that "[t]here may be similar names involved, but merely having similar names does not remove all genuine issues of material facts" (Docket No. 29, p. 10 of 11). Claimant presents no concrete evidentiary

12

material to refute this allegation.

In fact, the only further evidence Claimant sets forth is his own sworn Affidavit in which he states, "[a]s soon as the police started asking me questions about the money found inside of the vehicle, I told the officer that I did not want to speak to anyone before first speaking to an attorney" (Docket No. 29, Attachment 1, p. 1 of 2). Claimant further avers, "I did not deny ownership and/or knowledge of the $311,570.00 in United States currency. I stopped answering police questions before such a question was asked of me. I also never told any law enforcement officers where I was traveling to or whom I was traveling to see" (Docket No. 29, Attachment 1, p. 2 of 2). Not only are these statements contradicted by the sworn Declaration of Trooper Beidelschies (Docket No. 27, Attachment 1), they are clearly disproved by the audio and video recording of the December 30, 2011, traffic stop (Docket No. 31).

On this video, Claimant can be seen stepping out of the Traverse at approximately 10:25:25 and walking towards Trooper Beidelschies' patrol car (Docket No. 31). Once inside the car, Trooper Beidelschies asked Claimant several questions about his travels:[1]

| | |
|---|---|
| Trooper Beidelschies: | Where are you guys headed to today? |
| Claimant: | Chicago. |
| Trooper Beidelschies: | What brings you there? |
| Claimant: | Family. |
| Trooper Beidelschies: | Your family or his family? Are you guys brothers? |
| Claimant: | Yeah, he's my brother, my little brother. |

---

[1] It should be noted that the audio recording is muffled at points due to highway road and wind noise. The Court has made every effort to transcribe the conversations in as accurate a manner as possible.

| | |
|---|---|
| Trooper Beidelschies: | What part of Chicago [are] you going to? |
| Claimant: | Not exactly sure. He's been there. |
| Trooper Beidelschies: | He's been, you've never been there before? |
| Claimant: | No. |
| Trooper Beidelschies: | What relatives live there? |
| Claimant: | It's from his side. We're half-brothers. |

(Docket No. 31, 10:26:03 - 10:26:36). Trooper Beidelschies can then be seen questioning Medina, who is still in the Traverse (Docket No. 31, 10:27:55 - 10:28:16). He then returns to his patrol car and questions Claimant further about his travels:

| | |
|---|---|
| Trooper Beidelschies: | You said it was his family you were going to see? |
| Claimant: | It's kind of our family, but it's basically his, yeah. |
| Trooper Beidelschies: | Well, that's not what he says. |
| Claimant: | What did he say? |
| Trooper Beidelschies: | He said it was your family you're going to see. |
| Claimant: | Well, it's our family. |

(Docket No. 31, 10:28:53 - 10:29:07).

At 10:29:20, the video shows Trooper Arnold begin the dog sniff walk-around (Docket No. 31). Trooper Beidelschies questioned Claimant about what could possibly be in the vehicle:

| | |
|---|---|
| Trooper Beidelschies: | You can see she's walking the canine around your vehicle. |
| Claimant: | Ah, yeah, of course. Everything's good. |
| Trooper Beidelschies: | Is there anything illegal in there? |
| Claimant: | No. |

14

| | |
|---|---|
| Trooper Beidelschies: | Is there anything you're not supposed to have in your vehicle considered unusual? |
| Claimant: | No. |
| Trooper Beidelschies: | You don't have any large sums of money? |
| Claimant: | No. |
| Trooper Beidelschies: | Do you have any drugs in there? |
| Claimant: | No. |
| Trooper Beidelschies: | No weapons? |
| Claimant: | Positive. |

(Docket No. 31, 10:29:23 - 10:29:37). At 10:31:00, Trooper Beidelschies informs Claimant of the positive alert from K-9 Rony and his intent to do a probable cause search of the Traverse (Docket No. 31). Trooper Beidelschies *again* asked Claimant if there was anything unusual in the vehicle:

| | |
|---|---|
| Trooper Beidelschies: | Before I search it, is there anything I should be made aware of? Is there any money? |
| Claimant: | There's no narcotics, no money. |
| Trooper Beidelschies: | No guns, no nothing? |
| Claimant: | No, we have just a little bit of money just to drive. |

(Docket No. 31, 10:31:15 - 10:31:38). The troopers can then be seen searching the Traverse and pulling out bundles of money, two gym bags, and cell phones (Docket No. 31, 10:32:24 - 10:34:14). Trooper Beidelschies then returned to his patrol car, informed Claimant of his Miranda rights, and stated,

| | |
|---|---|
| Trooper Beidelschies: | There was a large sum of U.S. currency in there, man, do you know anything about the money . . . do you |

| | |
|---|---|
| | know anything about the money? |
| Claimant: | No, sir. |
| Trooper Beidelschies: | You don't know about it, you didn't know it was in there? |
| Claimant: | Wow, that's crazy. |

(Docket No. 31, 10:34:31 - 10:34:49).

Given this physical evidence, which directly contradicts and refutes Claimant's only proffered evidence, Claimant fails to meet his burden to show a genuine issue of material fact. As such, Plaintiff's Motion for Summary Judgment is granted.

**B.     MOTION FOR REMEDIES UNDER FED. R. CIV. P. 37(C)**

Simultaneous to its Motion to Strike and/or Motion for Summary Judgment, Plaintiff filed a Motion for Remedies under FED. R. CIV. P. 37(c), seeking to bar Claimant from supporting his claim with additional evidence that the government argues should have been turned over after its multiple discovery requests (Docket No. 26). In response, Mr. Lazzaro objects to any such finding, stating that the government's request for discovery, which was made via e-mail and, unbeknownst to him, had gone directly into his spam e-mail folder (Docket No. 29). Further, Mr. Lazzaro alleges that he and the government had previously agreed to extend discovery until after this Court ruled on Plaintiff's Motion for Summary Judgment (Docket No. 29).

Under FED.R.CIV.P. 37(c), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." The test itself is quite simple: "the sanction is mandatory unless there is

a reasonable explanation of why Rule 26 was not complied with or the mistake was harmless."
*Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*, 596 F.3d 357, 370 (6th Cir. 2010)
(*quoting Vance ex rel Hammons v. United States*, 1999 U.S. App. LEXIS 14943 (6th Cir. 1999)).
Given this Court's decision to grant Plaintiff's Motion for Summary Judgment, the Rule 37(c)
Motion is now moot, as discovery will be unnecessary. However, even in the absence of
summary judgment, this Court would be inclined to grant the government's motion.

     Plaintiff first submitted its interrogatories, requests for production, and request to depose
Claimant to Mr. Lazzaro via e-mail on February 15, 2013 (Docket No. 32, Attachment 1). On
March 4, 2013, Plaintiff sent an e-mail to Mr. Lazzaro reminding him of the discovery requests
(Docket No. 26, p. 2 of 3). On March 5, 2013, the government contacted Mr. Lazzaro via
telephone in an attempt to schedule Claimant's deposition (Docket No. 26, p. 2 of 3). Mr.
Lazzaro indicated that he needed a few days to locate his client (Docket No. 26, p. 2 of 3). Given
this delay, Plaintiff sought an extension of discovery and dispositive motion deadlines to June 1,
2013, and July 1, 2013, respectively (Docket No. 22). This Court granted the request on April 5,
2013 (Docket No. 23). Plaintiff did not hear from Claimant's counsel until May 22, 2013, nine
days before the new discovery deadline (Docket No. 32, p. 2 of 4). At that time, Mr. Lazzaro
claimed that the discovery requests unknowingly went to his spam folder (Docket No. 32, p. 2 of
4).

     This Court is certainly sympathetic to technological difficulties; however, based upon the
evidence of record, it is clear that Mr. Lazzaro was sufficiently put on notice of Plaintiff's
requests via multiple additional methods. The parties spoke of Plaintiff's discovery requests
during their telephone conversation on March 5, 2013 (Docket No. 26, p. 2 of 3). Mr. Lazzaro

does not deny this conversation. Plaintiff made reference to the discovery requests in its Motion to Extend Discovery, filed on March 28, 2013 (Docket No. 22). Furthermore, the government sent Mr. Lazzaro a hard copy of its discovery request via United States mail on February 15, 2013 (Docket No. 32, Attachment 2).

Mr. Lazzaro argues that he had a conversation with the government on June 14, 2013, during which the parties agreed to stay discovery pending resolution of the government's current motions (Docket No. 29, pp. 1-2 of 11). While Plaintiff admits speaking to Mr. Lazzaro on this date, it denies this alleged concession (Docket No. 32, p. 3 of 4). Rather, Plaintiff states that the purpose of the conversation was to inform Mr. Lazzaro of its intent to file a motion for summary judgment (Docket No. 32, p. 3 of 4).

The parties' original discovery deadline was April 1, 2013 (Docket No. 21). The extended deadline was June 1, 2013 (Docket No. 23). Even if the parties agreed to stay discovery pending resolution of Plaintiff's current Motions, both parties agree that such an agreement did not take place until at least June 14, 2013, two weeks *after* the extended deadline. Claimant offers no justification as to why he did not comply with the discovery deadline prior to its expiration.

## V. CONCLUSION

For the foregoing reasons, the Magistrate denies Plaintiff's Motion to Strike based on lack of standing. Plaintiff's Motion for Summary Judgment is granted in its entirety. Plaintiff's Verified Claim and Counterclaims are dismissed. **SO ORDERED.**

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date: November 22, 2013